IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

SONJA S. REEVES,                          )
                                          )
                    Plaintiff,            )
                                          )
        vs.                               )        No. CIV-04-745-C
                                          )
UNUM LIFE INSURANCE COMPANY               )
OF AMERICA, a Foreign Insurance           )
Company,                                  )
                                          )
                    Defendant.            )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Sonja S. Reeves (Reeves), was denied long-term disability benefits by her

employee benefit plan (the Plan).  She brought suit against Defendant, Unum Life Insurance

Company of America (UNUM), in the District Court of Oklahoma County, State of

Oklahoma, to recover benefits under the Plan.  Defendant removed the case pursuant to 28

U.S.C. §§ 1331, 1441, and 29 U.S.C. § 1132(e)(1).  In accordance with the briefing schedule

imposed by the Court, the parties have fully briefed the issue of whether Plaintiff was

wrongfully denied benefits under the Plan.  Therefore, the matter is now at issue.

### I. Background

Plaintiff was employed as an account executive with Household International, Inc.

(Employer).  (Administrative Record (AR), Dkt. No. 39, at 13.)  The Employer provided a

long-term disability benefit plan issued by UNUM for eligible employees.  (AR at 729.)

Under the terms of the policy, an eligible employee who provides proof that she is disabled

because of sickness or injury and requires the regular attendance of a doctor is entitled to a

monthly benefit.  (AR at 718.)  An employee is disabled if, because of illness or disease, she "cannot perform each of the material duties of [her] regular occupation; and after benefits have been paid for 12 months, . . . cannot perform each of the material duties of any gainful occupation for which [s]he is reasonably fitted by training, education or experience," or is working part-time and earning less than 20% of her pre-disability earnings.  (AR at 720.)

After collapsing at work on October 18, 2002, Reeves applied for and received short-term benefits for the period of October 24, 2002, through November 26, 2002.  (AR at 21-22.)  Her claim was then transferred for consideration of long-term benefits under the Plan. (AR at 40.)  UNUM set the date for determining Reeves' disability as October 19, 2002, a date Reeves does not contest.  (AR at 22.)

Towards the end of her six-month elimination period, UNUM contacted Reeves through her counsel, Mr. Bower, and requested "detailed information regarding her restrictions and limitations" and instructed Reeves to execute a medical release form.  (AR at 75-76.)  UNUM also quoted the policy definition of "disabled" and indicated that, under the policy, Reeves had 45 days to provide proof of her claim, which must cover:  (1) the date the disability started; (2) the cause of the disability; and (3) the seriousness of the disability. (Id.)

Almost immediately, Mr. Bower faxed UNUM a February 25, 2003, letter from Dr. Griffith Miller, in which the doctor offers the following opinions:

> Mrs. Reeves suffers from several disorders.  The main disorder is Fibromyalgia.  She also suffers from heavy metal intoxication. . . .  In addition,

she has Candida, which is a yeast . . . .  She has a viral infection of Epstein-Barr. . . .

As far as her ability to work is concerned, it is my medical opinion that Mrs. Reeves cannot do the following:  She cannot sit for over an hour at a time, . . . she has to recline frequently; She cannot lift more than 5 pounds; She cannot walk for distances of over a [sic] 100 feet without extreme fatigue and pain. She is so fatigued and has such headaches that it is extremely difficult for her to concentrate for over 15 minutes at a time.

(AR at 78.)

Mr. Bower also mailed several other sets of Reeves' medical records.  These records documented treatment by Dr. Joseph Fletcher in November and December 2002 for a suspected irritable bowel syndrome (AR at 83-90), and chiropractic treatment by Dr. William Ellis from December 2001 through August 2002 (AR at 91-104).  Also submitted were hospital records for the Mayo Clinic where Reeves received treatment in 1988 (AR at 105-20), and chiropractic records for Spring 2001 of Dr. Jennifer Sheppard (AR at 121-23). Medical records of Dr. Mukesh Saraiya from Reeves' hospitalization in December 2000 for unexplained weight loss indicated a discharge diagnosis of "severe fibromyalgia with marked generalized weakness and muscle spasms." (AR at 124-32.)  Medical records from 1997-99 indicated that Dr. Carnahan diagnosed and treated Reeves for fibromyalgia . (AR at 133-42.) Also included in the packet were copies of toxic metal tests conducted in 2001 and 2002. (AR at 162-65.)

Additionally, Mr. Bower sent UNUM copies of Reeves' medical records from the Wellness Clinic of Southern Oklahoma, where she was treated for chronic pain by Dr. Benjamin Fore and P.A. Robert Oldham.  (AR at 145-66.)  These records indicate that she

3

was seen by Dr. Fore approximately ten times in a six- to seven-month period in mid-to-late 2002. (Id.)  The records indicate that beginning in July 2002, Reeves began complaining of not being able to sleep, being unable to get out of bed in the morning because of pain, and suffering from severe work stress.  (Id.)  Reeves apparently commented that she didn't "know how long I can work – I have to work until I can get disability." (AR at 215.)  Dr. Fore noted that Reeves should change jobs for health reasons and referred to her to another doctor for chronic pain management.  (AR at 215-17.)

Shortly thereafter, Mr. Bower submitted Reeves' medical release and an updated letter from Dr. Miller.  (AR at169-74.)  In the letter, Dr. Miller indicates that Reeves "cannot sit at a work-station . . . .  She cannot stand in one place for more than 2-3 minutes at a time without having to sit down . . . .  She can walk . . . a minute to two minutes at a time" and could do repetitive motions such as entering data into a computer for only a minute or two at a time.  (AR at 173.)  According to Dr. Miller, these restrictions are caused by fibromyalgia.  (Id.)  Dr. Miller indicates that laboratory tests and the objective findings from examination confirm the diagnosis of fibromyalgia.  (Id. at 172-73.)

After receiving copies of Reeves' executed medical releases, UNUM requested medical records from her doctors.  (AR at 179-86.)  Prior to reviewing Reeves' records, however, UNUM commenced payment of monthly benefits to Reeves under a reservation of rights.  (AR at 190-91.)  UNUM cautioned that the payment should not be construed as an admission of liability.  (Id.)

UNUM received the medical records as requested.  From Dr. Ellis, UNUM received additional medical records, a completed Physical Residual Functional Capacity Questionnaire (Ellis RFC Questionnaire), and electrophysiological study (including a range-of-motion test) performed on Reeves at the request of Dr. Ellis.  (AR at 206-30, 384-402.) The Ellis RFC Questionnaire indicates Reeves' symptoms or pain would "constantly" interfere with her attention and concentration, Reeves would be "severely limited" in her ability to deal with work stress, she could sit for less than two hours in an eight-hour work day, and would likely miss work more than three days per month because of her "impairments or treatment."  (AR at 398-401.)  Additionally, it indicated that Reeves could occasionally lift "less than 10 pounds" and could bend or twist at the waist for 10-15% of an eight-hour day.  (Id.)  UNUM also received a letter, RFC Questionnaire (McKown RFC Questionnaire) and medical records from another chiropractor, Dr. Alan McKown, for treatments from 1995 through 2001.  (AR at 231-383.)  The McKown RFC Questionnaire also indicates Reeves' symptoms or pain would "constantly" interfere with her attention and concentration, Reeves would be "severely limited" in her ability to deal with work stress, she would likely miss work more than three days per month because of her "impairments or treatment," and that she could occasionally lift less than ten pounds (5 lbs. maximum), but that she could sit for two hours in an eight-hour work day and could not bend or twist at the waist at all.  (AR at 376-81.)  Finally, UNUM received copies of medical records and tests performed or requested by Dr. Miller.  (AR at 409-28.)

Nurse Linda Pendergrass of UNUM reviewed Reeves' medical records. (AR at 444-447.) Nurse Pendergrass indicated that it was unclear whether the information provided was consistent with the medical records. (AR at 445.) Additionally, Reeves' work capacity was also unclear. (Id.) Nurse Pendergrass referred Reeves' file for review by Dr. Stephen Jacobson, UNUM's Vice President and Medical Director. (Id.; AR at 449-51.)

Dr. Jacobson also reviewed Reeves' medical information in an attempt to answer the questions presented: "Do the medical records support the claimant's diagnosis of influenza with respiratory manifestations[1] – mercury poisoning and fibromyalgia? Do the records provide[d] support work capacity impairment?" (AR at 451.) Dr. Jacobsen answered both questions in the negative. (Id.)

Dr. Jacobson found that the record did not support a finding of mercury poisoning at or around the date of Reeves' disability. (AR at 450.) After reviewing the laboratory tests documenting the presence of metals in Reeves' urine, Dr. Jacobson noted that these tests were conducted post-provocation with a provoking agent (DMPS). (AR at 451.) Although Reeves' tests indicated that the presence of potentially toxic metals in her urine was above the normal reference range, the reference ranges were representative of a healthy population under "non-provoked" conditions. (AR at 165, 451.) Thus, Dr. Jacobson indicated that the tests were not reliable for a conclusion of heavy metal poisoning. (AR at 451.) Dr. Jacobson noted that although Reeves' prior occupation as a dental hygienist could result in mercury

---

[1] Apparently someone at UNUM had entered the wrong diagnosis code. It is conceded that Plaintiff did not have influenza. (Def.'s Br. 6 n.11.)

exposure, Reeves had been out of that occupation for several years.  (AR at 450.)  Dr. Jacobson also noted that Reeves had her dental amalgams, a known source of mercury, removed in January 2001.  (Id.)  Dr. Jacobson opined that the file did not contain any documentation to support the conclusion that Reeves was suffering from heavy metal poisoning at or around the date of disability.  (Id.)

Dr. Jacobson also concluded that the medical records submitted did not support a diagnosis of fibromyalgia.  (AR at 450.)  Specifically, Dr. Jacobson noted the absence of a documentation of 11 of 18 tender points to fulfill the ACR criteria for fibromyalgia.  (Id.)  According to Dr. Jacobson, Reeves' treatment was not consistent with that "recommended by Kelly's Textbook of Rheumatology," which consists of "education, antidepressants, stress management, cognitive behavioral therapy, aerobic exercise, and pain management."  (Id.)

Finally, Dr. Jacobson concluded that the file did not support Reeves' claim that she was unable to work.  (AR at 449.)  Dr. Jacobson noted a lack of "documentation of clinical findings or tests to support a conclusion that [Reeves'] condition changed at or around the [date of disability]."  (Id.)  Dr. Jacobson references a portion of a statement made by Reeves to Dr. Ellis on August 27, 2002, in which she said "I have to work until I can get disability."[2] (Id.; AR at 215 ("I don't know how long I can work – I have to work until I can get disability."))  Finally, Dr. Jacobson indicates that the file lacks any "formal physical or cognitive functional testing," thus concluding that Reeves has not presented proof that she

_____

[2] Presumably, Dr. Jacobson refers to this partial statement to undermine Reeves' credibility in reporting symptoms or question her motivation in seeking benefits.

7

was "unable to perform at a functional level after the [date of disability] that she was able to perform prior to the [date of disability]."  (AR at 449.)

Prior to Dr. Jacobson completing his initial report, Reeves submitted two Fibromyalgia Residual Functional Capacity Questionnaires, one from Dr. Ellis and one from Dr. Fore.[3]  (AR at 456-63; 472-88.)  Both doctors indicate that Reeves meets the American Rheumatological criteria for fibromyalgia and report Reeves' prognosis as poor or very poor. (AR at 463, 488.)  Dr. Jacobson did not review these additional records before issuing his initial report.

In the additional submission, Dr. Ellis indicated that the following clinical findings, laboratory, and test results demonstrated Reeves' impairments:  physical exam of the tender areas; a tender points fibromyalgia diagnostic exam (dated June 27, 2003); and an EMJ scan (dated Dec. 17, 2001).  (AR at 463, 456-57.)  Dr. Ellis indicated that Reeves has fourteen of the possible twenty-four symptoms of fibromyalgia.  (AR at 462.)  According to Dr. Ellis, Reeves' symptoms were severe enough to frequently to constantly interfere with her attention and concentration.  (AR at 461.)  Dr. Ellis considered Reeves to be severely limited in her ability to deal with work stress.  (AR at 460-61.)  Dr. Ellis also identified the following functional limitations:  (1) ability to continuously sit for 30-45 minutes for "less than 2 hours" per day; (2) a need to take unscheduled breaks throughout the day for 15 minutes to one hour at a time; (3) an inability to lift or carry anything over ten pounds (Dr. Ellis opined

---

[3] These reports were submitted on the 22nd and 28th of July 2003.  Dr. Jacobson completed his report on July 30, 2003.

that Reeves could lift and carry less than ten pounds "frequently"); and Reeves could bend or twist at the waist no more than 10% of an eight-hour day.  (AR at 458-60.)

Dr. Fore identified the following findings as demonstrating Reeves' impairments: "tender points, weakness, fibrous muscle changes, elevated mercury level (8.1), poor range of motion, difficulty ambulating – poor balance, shortness of breath, generalized weakness + easily fatigued."  (AR at 488.)  Dr. Fore identified sixteen of the possible twenty-four symptoms of fibromyalgia.  (AR at 487.)  Consistent with Dr. Ellis, Dr. Fore found that Reeves' symptoms would frequently to constantly interfere with her attention and concentration and that Reeves would be severely limited in her ability to deal with work stress.  (AR at 485-86.)  Dr. Fore also concluded that Reeves could sit for only thirty minutes at a time, for less than two hours in an eight-hour day, and would need to take unscheduled breaks every 15-30 minutes for one to two hours where she could recline.  (AR at 484-85.)  Dr. Fore indicated that Reeves could never lift anything over five pounds and could do no bending or twisting at the waist.  (AR at 483-84.)

Dr. Jacobson later reviewed these questionnaires, but did not change his conclusions. (AR at 490-91.)  Dr. Jacobson noted that the "tender points" examination conducted by Dr. Ellis was completed in June, almost eight months after the date of Reeves' alleged disability. (AR at 491.)  Dr. Jacobson also pointed out that while Reeves was receiving frequent treatment around the time of her collapse, the records do not indicate a marked change in treatment or reported symptoms around this time.  (AR at 491, 475.)  Dr. Jacobson also compared the fibromyalgia questionnaires from Drs. Ellis and Fore, and noted that Dr. Ellis

9

indicates Reeves could lift and carry less than ten pounds frequently, Dr. Fore indicated Reeves could never lift and carry "less than 10 pounds" but was limited to five pounds. (AR at 490.) Dr. Ellis also indicated Reeves could bend and twist at the waist 10% of a work day, where Dr. Fore indicated she could not bend and twist at the waist at all. (Id.)  Finally, Dr. Jacobson criticized what the doctors relied on as objective evidence, indicating that the "tender points examination" is "a self-report of a patient's response to pressure applied to a point and does not represent functional impairment" and the two most recent reports from Dr. Fore (3/29/03 and 6/28/03 visits) do not support Dr. Fore's "clinical findings." (Id.) Dr. Jacobson declined to alter his conclusion stating that "[n]either doctor references formal functional testing as a basis for determining Ms. Reeve's [sic] functional abilities and limitations." (Id.) Jacobson does note, however, that the "tender points" examination fulfills "the ACR criteria for [fibromyalgia] on 6/27/03." (Id.)

Relying on the Dr. Jacobson's findings, UNUM denied Reeves' claim.  The denial centers on (1) lack of evidence of heavy metal poisoning at the time of disability, (2) no clinical findings of fibromyalgia around the date of disability, (3) inconsistencies in the doctors' reports regarding Reeves' functional capacity, and (4) lack of formal functional testing.  (AR at 500-02.)

With the assistance of Mr. Bower, Reeves appealed the decision denying her benefits. (AR at 663.)  Reeves requested, and was granted, a thirty-day extension to submit additional medical documentation for her appeal.  (Id.; AR at 664.)

10

UNUM never issued a final decision on Reeves' appeal.  In a letter dated April 27, 2004, UNUM indicated that it had misplaced Reeves' file and would need up to 45 days to make a decision regarding the appeal, but "barring no additional complications," it should have the review completed within thirty days.  (AR at 685.)  Mr. Bower claims he received this letter on May 10, 2004.  (AR at 757.)  While the letter was allegedly "in transit," Mr. Bower faxed a letter indicating his opinion that the appeal time had run and no extension had been requested and threatening suit if a final decision was not made within a week.  (AR at 754-55.)  However, upon receipt of the letter from UNUM requesting an extension, Mr. Bower sent another letter indicating that he expected to file suit sometime after May 17.  (AR at 757.)  Reeves filed her petition on May 19, 2004.  (Docket Sheet from Dist. Ct. of Okla. Co., Dkt. No. 1 Exh. B.)

## Standard of Review

A denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is reviewed de novo unless the benefit plan gives the administrator discretionary authority to determine a participant's eligibility for benefits.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  If such discretionary authority is granted, the review of an administrator's denial of benefits is measured by the "arbitrary and capricious" standard.  Gilbertson v. Allied Signal, Inc., 328 F.3d 625, 630 (10th Cir. 2003).

Where an administrator acts under a conflict of interest, the Court gives less deference to its decision.  Fought v. UNUM Life Ins. Co. of Am., 379 F.3d 997, 1003 (10th Cir. 2004), cert. denied, ___ U.S. ___, 125 S.Ct. 1972 (2005).  Where a party acts as both the insurer and

administrator, it has an "inherent conflict of interest" and "an appropriate reduction in deference is appropriate." Id. at 1006.  In such cases, the burden shifts to the administrator to "'justify the reasonableness of its decision'" by demonstrating that its denial is supported by substantial evidence.  Id. (quoting Kathryn J. Kennedy, Judicial Standard of Review in ERISA Benefit Claim Cases, 50 Am. U.L. Rev. 1083, 1174 (2001)).  "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker].  Substantial evidence requires more than a scintilla but less than a preponderance."  Sandoval v. Aetna Life & Ins. Co., 967 F.2d 377, 382 (10th Cir.1992) (internal quotation marks and citations omitted) (alteration in original).

Further, in cases where "substantial violations of ERISA deadlines result in the claim's [sic] being automatically deemed denied on review," the Court reviews the denial de novo.  Gilbertson, 328 F.3d at 631.  The reasoning for the heightened review is that there is no deference to an administrator's expertise when the administrator fails to exercise that expertise and render a reasoned decision.  Id. at 632.

Previously, the Tenth Circuit has cautioned that this is not a "hair-trigger" rule where every minor violation results in de novo review.  Id. at 635.  The circuit court has indicated that where an administrator fails to render a timely decision that "substantially complies" with the regulatory requirements, de novo review does not apply.  Id.  An administrator substantially complies when the delay is either inconsequential or pursuant to an "on-going, good-faith exchange of information between the administrator and the claimant."  Finley v. Hewlett-Packard Co. Emp. Ben. Org. Income Protection Plan, 379 F.3d 1168, 1174 (10th Cir.

12

2004).  Additionally, the Court will defer to an administrative decision where a claimant does

not provide "'meaningful new evidence or raise significant new issues [on administrative

appeal],' . . . and the delay does 'not undermine [the court's] confidence in the integrity of

[the administrator's] decision-making process.'"  Id. (citations omitted) (alterations in

original).

This is where the parties differ.  There is no question that UNUM has discretion to

determine a participant's eligibility in benefits, or that UNUM is operating under an inherent

conflict of interest.  Similarly, there is no question that UNUM failed to render a final

decision on appeal within the time period prescribed by regulation.[4]  UNUM argues that it

has substantially complied with the procedural requirements and that any noncompliance was

inconsequential.  Although it misplaced Reeves' file, UNUM asserts that it immediately

corrected the situation by proceeding with the review and by notifying Mr. Bower of the

oversight and requesting an additional thirty days.  Reeves counters by noting that

(1) requests for extension of time should be submitted prior to the expiration of the original

period, and (2) UNUM has not offered an excuse for failing to issue a final decision by May

19, 2004, the date the decision was due *with* the requested extension.  (See Def.'s Br. n.21.)

Reeves also questions the truthfulness of UNUM's statements about what actually happened

to Reeves' file, noting that UNUM's letter was dated two days before Reeves' demand letter

---

[4] Indeed, UNUM never issued a final decision at all, as Reeves filed suit on May 19 and UNUM was still conducting medical reviews in the first part of June.

yet it took almost two weeks for Mr. Bower to receive it.[5]  Finally, Reeves asserts that she provided significant new evidence on appeal and, thus, UNUM's initial denial cannot effectively be applied to her appeal.

The parties also differ on whether the substantial compliance exception remains good law since the relevant regulations were revised in 2002.  Reeves relies primarily on a footnote in Finley, where the Tenth Circuit explicitly reserved this question.  Finley, 379 F.3d 1175 n.6.

In November 2000, the Department of Labor (Department) amended the procedural requirements for plans providing disability benefits.  65 Fed. Reg. 70246 (Nov. 21, 2000). Among the changes were revisions to the time frames permitted for resolving disability claims.  Id. at 70246, 70249 (permitting a maximum 45-day review period that may be extended once for an additional 45 days if special circumstances require); 29 C.F.R. § 2560.503-1(i)(3)(i) (adopting the requirements of 29 C.F.R. § 2560.503-1(i)(1)(i)).  An example of a special circumstance justifying an extension of the review time is "the need to hold a hearing."  29 C.F.R. § 2560.503-1(i)(1)(i)).  Where an extension is necessary, the administrator must provide written notice to the claimant "prior to the termination of the initial [45]-day period."  Id.  In addition, the Department eliminated the "deemed denied"

---

[5] UNUM asserts that it misplaced Reeves' file and "triaged" her claim for medical assessment by April 19, 2004 (versus placed for final decision).  (AR at 685.)  The medical response by Nurse Brenda Nunn confirms that the file was indeed referred to her on April 19.  (AR at 688-95.)  However, UNUM did not notify Mr. Bower that the file had been misplaced, found, and referred until over a week later on April 27.  (AR at 685.)  The delay in notifying Mr. Bower of the misplaced file and the significant delay in Mr. Bower's receipt of this notice are highly suggestive that the April 27 letter was actually written after Mr. Bower's April 29 letter.

provisions of the prior regulation and instead provided that "if a plan fails to provide processes that meet the regulatory minimum standards, the claimant is deemed to have exhausted the available administrative remedies and is free to pursue the remedies available under section 502(a) of the Act."  65 Fed. Reg. at 70255.

The Court agrees that the substantial compliance doctrine is not applicable under the revised regulations.  In waiving the administrative exhaustion requirement for plans that fail to comply with the procedural requirements, the Department noted that "[m]any commenters . . . argued that [29 C.F.R. § 2560.503-1(*l*)] would impose unnecessarily harsh consequences on plans that substantially fulfill the requirements of the regulation, but fall short in minor respects."  Id.  Notwithstanding these comments, the Department rejected two proposals that would excuse minor violations and impose some form of a substantial compliance standard.  Id. at 70255-56 (rejecting a proposed good faith or actual prejudice standard).  The Department concluded that:

> Inasmuch as the regulation makes substantial revisions in the severity of the standards imposed on plans, we believe that plans should be held to the articulated standards as representing the minimum procedural regularity that warrants imposing an exhaustion requirement on claimants.  In the view of the Department, the standards of the regulation represent essential aspects of the process to which a claimant should be entitled under section 503 of the Act. A plan's failure to provide procedures consistent with these standards would effectively deny a claimant access to the administrative review process mandated by the Act.

Id. at 70256.  Thus, the Department rejected the notion of "substantial compliance" and concluded that "a decision made in the absence of the mandated procedural protections should not be entitled to any judicial deference."  Id. at 70255.

The Court acknowledges the apparently contrary decision in <u>Oman v. Intel Corp.</u> <u>Long Term Disability Benefit Plan</u>, No. 03-1591-AA, 2004 WL 2384965 (D. Or. Oct. 21, 2004), where that court applied the substantial compliance doctrine to the amended regulations. <u>Id.</u> at *4. However, the <u>Oman</u> court did not reference 29 C.F.R. § 2560.503-1(*l*) at all, nor the Department's rejection of two versions of a substantial compliance doctrine, but instead focused solely on the elimination of the "deemed denied" provision. <u>Id.</u> at *4-5. Thus, the Court finds <u>Oman</u> unpersuasive.

Concluding that the substantial compliance doctrine does not apply and noting that it is undisputed that UNUM did not comply with the procedural requirements of 29 C.F.R. § 2560.503-1(i)(1)(i) (incorporated by § 2560.503-1(i)(3)(i)) when it failed to issue a timely decision on Reeves' appeal or timely request an extension of time, the Court determines that the applicable standard of review is de novo.

## Discussion

UNUM's denial of Reeve's long-term benefits claim appears to be based on two conclusions: (1) that Reeves did not provide proof that she had an illness or disease (fibromyalgia); and (2) that Reeves did not provide proof that the illness or disease prevented her from performing the material duties of her regular occupation.[6] Initially, UNUM's Dr. Jacobson concluded that Reeves had not proven she had fibromyalgia because she had not

---

[6] There is quite a bit of discussion in the record about heavy metal poisoning. However, Reeves seems to attribute this as a contributing factor to the fibromyalgia, which, in turn, caused her disability. Thus, the Court focuses solely on the fibromyalgia.

submitted documentation that she met the ACR criteria for fibromyalgia and was not participating in a coordinated treatment program for fibromyalgia.  Dr. Jacobson discounted the test later submitted because it was dated eight months after the date of alleged disability.

Fibromyalgia is a controversial diagnosis because it is diagnosed entirely from a patient's self-reports of pain and reported symptoms.  Moore v. Barnhart, 114 Fed. Appx. 983, 991 (10th Cir. 2004) (unpublished decision).  "'There are no laboratory tests for the presence or severity of fibromyalgia.'"  Id. (quoting Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996)) (emphasis omitted); Gilbertson, 328 F.3d at 628 n.1.  Symptoms include poor sleep, anxiety, fatigue, and irritable bowel syndrome.  The Merck Manual 481 (Mark. H. Beers, M.D. and Robert Berkow, M.D. eds., Merck Research Laboratories 1999) (1899).  The predominant symptom, however, is chronic widespread pain in the "fibrous tissues, muscles, tendons, ligaments, and other sites," especially in the neck, shoulders, thorax, lower back, and thighs.  Id.  The onset of fibromyalgia is gradual and its cause is unknown. Id.; American College of Rheumatology, Fibromyalgia Fact Sheet, http://www/rheumatology.org/public/factsheets.fibromya.asp (last visited June 13, 2005). According to the American College of Rheumatology, the illness affects approximately two-percent of the United States population.  Fibromyalgia Fact Sheet, supra.

In 1990, the American College of Rheumatology identified the criteria of classifying fibromyalgia.  If a patient has (1) a history of widespread pain for at least three months and (2) pain in 11 of 18 tender points on digital palpation, the patient will be said to have fibromyalgia. Frederick Wolfe, et al., The American College of Rheumatology 1990 Criteria

for the Classification of Fibromyalgia, 33-2 Arthritis Rheumatism, Feb. 1990, at 160; see also AR at 450.

There is no question that Reeves reported widespread pain for at least three months prior to the date of her alleged disability.  Additionally, it is conceded that Reeves met the "tender points" criteria eight months *after* her date of alleged disability.  The question is, whether the absence of an earlier "tender points" examination is fatal to Reeves' claim.  The Court holds that it is not.

The "tender points" examination does not report a *change* in Reeves' condition, but merely confirms and supports the prior diagnosis of several other doctors.  Cf. Finley, 379 F.3d at 1174 (rejecting medical evidence that the plaintiff has 'retrogressed' since the doctor's prior exam because it was not relevant).  Indeed, this examination can be likened to one that UNUM itself could have ordered, should it have desired an independent medical exam.  (See AR at 707.)  As early as 1997, Dr. Carnahan suspected fibromyalgia because of a "long standing history of chronic back pain," "intense pain to her cervical, thoracic and lumbar region," "[p]ain that radiates into both arms and legs," lack of sleep, depression, anxiety, "trigger points behind her knees and elbows."  (AR at 141.)  This diagnosis was confirmed by Dr. Saraiya, who noted Reeves had "severe fibromyalgia with marked generalized weakness and muscle spasms."  (AR at 127.)  As noted by Dr. McKown, during the first few years of treatment, Reeves' "symptoms would wax and wain [sic]."  (AR at 383.)  However, by 2002, every record of Reeves' treating physician, Dr. Fore, indicates that Reeves was suffering from "chronic pain," and "anxiety" and was being treated by her

18

chiropractor and with trigger point injections.[7]  (AR at 145-66.)  Additionally, Dr. Miller

indicated that Reeves has pain in all "10 pain points, behind the neck, 3 places in the thoracic

spine, the low back, the lumbar spine, and behind the knees."  (AR at 172.)  Because the

"tender points" examination merely clarifies and confirms what is contained in Reeves' other

medical records, it is relevant to a diagnosis of fibromyalgia on the date of her alleged

disability.[8]  Perhaps most significantly, there is no evidence in the record to counter these

doctors' findings.  Accordingly, the Court finds that UNUM erred when it found that Reeves

did not present proof of an illness or disease, fibromyalgia.

    This conclusion does not end the inquiry, however.  The more difficult question is

whether the fibromyalgia prevented Reeves from performing the essential functions of her

job.

    The first step in making this determination requires an analysis of Reeves' limitations.

In support of her claim, Reeves submitted several functional capacity questionnaires.  Each

indicated that Reeves' symptoms (1) constantly interfered with her concentration, (2) resulted

in her being severely limited in dealing with work stress, (3) would cause her to be absent

---

    [7] Trigger point injections are injections of lidocaine or hydrocortisone into the "[i]ncapacitating areas of focal tenderness."  The Merck Manual, supra at 482.

    [8] The Court notes that Reeves may not have been participating in a "coordinated treatment program for fibromyalgia as recommended by Kelly's Textbook of Rheumatology" (AR at 450), as asserted by UNUM, but was receiving treatment consistent for fibromyalgia including trigger point injections and anti-depressants. The Merck Manual, supra at 782.  Further, the fact that she was not seeing a specialist for her fibromyalgia is not dispositive.  See American College of Rheumatology, Fact Sheet http://www.rheumatology.org/public/factsheets/firbromya.asp (last viewed on June 13, 2005) (indicating that "fibromyalgia can generally be treated by your primary care physician").

more than three times per month, (4) limited her ability to sit to 30-45 minutes at a time, with no more than two hours in an eight-hour day, and (5) required her to take frequent and unscheduled breaks.  (AR at 398-401, 376-81, 456-63, 472-88.)

The doctors do differ in the amount of weight Reeves could lift and carry and whether Reeves could bend and twist at the waist.   UNUM's Dr. Jacobson points out these "inconsistencies," apparently relying on them to support the denial of benefits.  Although conflicting evidence is potentially relevant, see Fought, 379 F.3d at 1014-15, it does not support UNUM's position here.  Any "conflict" between the reports is, on the surface, extremely minor and understandable as the perception of each doctor is bound to be slightly different.  Additionally, even the evidence of functional limitations most favorable to UNUM limits Reeves to lifting ten pounds and bending and twisting no more than 10% of an eight-hour day.[9]   These apparent inconsistencies could have been resolved easily with an independent medical examination.  Although not always required, a capacity assessment by an independent examiner or another form of investigation could have shed light on Reeves' true limitations.  See Fought, 379 F.3d at 1015.  Based on the record, there is nothing about these minor differences in opinion that would undermine the doctors' reports or support the conclusion that Reeves was not functionally limited as reported.

---

[9] Although these differences appear slight, the Court acknowledges that in some circumstances, they may be material.  However, as discussed further below, the Court cannot make such a determination because it has no evidence of whether lifting between five and ten pounds and bending and twisting at the waist is essential to Reeves' occupation.

It is not enough, however, that Reeves was limited in her functional abilities – those limitations must be relevant to the essential duties of Reeves' job.  Unfortunately, the record is devoid of a list of material duties or job description for Reeves' occupation.[10]

The Court must consider then, whether, in the absence of such evidence, the record nonetheless indicates that Reeves could perform her job as a loan originator.  UNUM argues that there was no marked change in Reeves' fibromyalgia around the time of disability and if she could perform those functions before, she can do them now.  Although this argument has some appeal, it is not supported by the record.  Before her collapse, Reeves began reporting to Dr. Fore that she wasn't sleeping, she was "stressed out," "depressed," "anxious," and that she did not know how much longer she could continue working.  (AR at 145-66.)  Dr. Fore treated Reeves with medication and trigger point injections but noted that Reeves should consider changing jobs for health reasons.  (Id.)  Between October 14 and November 1, 2002, Reeves also saw Dr. Ellis for treatment seven times.[11]  (AR at 475.)  Finally, within days of her collapse, Reeves went back to see Dr. Miller for further treatment.  (AR at 422.)  Additionally, the Court notes that Reeves' non-hourly compensation in the two months preceding her collapse was significantly less than her average during the previous year.  (See AR at 431-38; Pl.'s Exh. A.)  Although these records do not demonstrate an

---

[10] In a letter to Reeves in October 2002, UNUM indicated that it had requested information about Reeves' occupation from her employer.  (AR at 51-52.)  However, there is no request in the record, nor any indication that anything, if requested, was ever received.

[11] Reeves' records indicate that she had been seeing Dr. Ellis anywhere from twice a week to once a month.  (AR at 475-78.)

overwhelming change in symptoms or treatment after Reeves' collapse, there is evidence of an escalation of symptoms and an increase in the frequency and type of treatment. (See also Gutierrez Assessment, AR at 575-82.) Thus, without any indication as to what Reeves' job duties entailed, UNUM could not have reasonably or correctly concluded that Reeves was limited in performing them.[12]

The question remains, however, whether the Court may determine that Reeves *was* disabled absent proof of the essential duties of her job. The Court finds that it can make such a determination. See Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276, 1288-89 (10th Cir. 2002) (remand for further fact-finding is unnecessary where there is only one reasonable result or the administrator's actions were arbitrary and capricious). Even assuming Reeves' job was sedentary, she would have been unable to sit for more than 30-45 minutes at a time, could stand for the same amount of time, would have required frequent and unscheduled breaks, and, at the most, could only sit (and thus, work) for two hours a day. Further, her symptoms would reportedly have prevented her from being able to concentrate on her work, and would have severely limited her in dealing with work stress. It defies logic that the duties of a loan officer were stress-free, required Reeves to work no more than a two-hour day (four hours if she could alternate between sitting and standing while working), permitted unscheduled and frequent breaks that may last up to two hours each, and did not require her to concentrate or pay attention. The only reasonable conclusion is that Reeves could not

---

[12] In making this statement, the Court is holding that, even under an arbitrary and capricious with reduced deference standard, UNUM's denial would not be reasonable.

"perform each of the material duties of [her] regular occupation" and met the policy definition of disabled.[13]  (AR at 720.)

### Conclusion

The Court concludes that Reeves was wrongfully denied benefits under the long-term disability policy issued by UNUM.  Although Plaintiff briefed the issue of damages in its opening brief, Defendant reserved the issue.  Accordingly, the Court sets the following briefing schedule: Defendant to file its Response to Plaintiff's argument on damages by Friday, July 15.  Plaintiff shall then have until Wednesday, July 27, to file a Reply.  Upon a ruling on damages, the Court will issue a judgment under Rule 54(b) and remand the remaining matter to the UNUM administrator for further fact-finding pursuant to the Plan's standard for "any occupation" disability (see AR at 720 ¶ 2).

IT IS SO ORDERED this 28th day of June, 2005.

ROBIN J. CAUTHRON
United States District Judge

---

[13] By concluding that Reeves is disabled according to the definition quoted, the Court offers no opinion regarding whether Reeves meets the criteria for disabled for "any occupation."  This decision requires significantly more fact-finding and an interpretation of the Plan's terms. Accordingly, that decision must be remanded to the administrator "for a full and fair review of the record in light of the 'any occupation' standard."  Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276, 1289 (10th Cir. 2002).